IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA15-172

Filed: 5 January 2016

Wake County, No. 11 CVS 15178

RICHARD B. SPOOR, Individually and Derivatively, Plaintiff,

v.

JOHN M. BARTH, JR., JOHN M. BARTH, JOHN DOES 1-5, and J.R. INTERNATIONAL HOLDINGS, LLC, Defendants.

Appeal by plaintiff from order entered 19 June 2014 by Judge Allen Baddour in Wake County Superior Court. Heard in the Court of Appeals 26 August 2015.

> *Smith Moore Leatherwood LLP, by Matthew Nis Leerberg and Sidney S. Eagles, Jr., and Barry Nakell for plaintiff-appellant.*

> *Manning Fulton & Skinner, P.A., by Judson A. Welborn and J. Whitfield Gibson, for defendant-appellee John Barth, Jr.*

> *Wilson & Ratledge, PLLC, by Reginald B. Gillespie, Jr. and N. Hunter Wyche, Jr., and Foley & Lardner LLP, by Michael J. Small and David B. Goroff, for defendant-appellee John M. Barth.*

McCULLOUGH, Judge.

Plaintiff Richard Spoor appeals from an order of the trial court granting summary judgment in favor of defendants John M. Barth and John M. Barth, Jr. Based on the reasons stated herein, we reverse the order of the trial court.

I.     Background

On 5 October 2011, plaintiff Richard Spoor filed a complaint against John M. Barth, Jr. ("Junior"), John Doe, Sr., and John Does in Wake County Superior Court. On 14 February 2012, plaintiff filed his first amended complaint against Junior, John Barth, Sr. ("Senior"), John Does 1-5, and JR International Holdings, LLC ("JRI") (collectively "defendants").

On 16 February 2012, Junior removed the case to the United States District Court for the Eastern District of North Carolina. On 31 October 2012, the action was remanded to Wake County Superior Court.

On 16 June 2012, plaintiff filed his Second Amended Complaint against defendants. The complaint alleged as follows: Plaintiff was the chairman and majority shareholder of AmerLink, Ltd. ("AmerLink"). AmerLink was a North Carolina corporation "engaged in the business of selling packages of materials for the construction of log homes." Junior was President of AmerLink and Senior was Junior's father. JRI is a North Carolina corporation. Plaintiff owns 50% and Junior owns 50% of JRI. In September 2006, Junior became President and CEO of AmerLink and Junior told plaintiff that he was interested in purchasing plaintiff's controlling interest in AmerLink with the use of Senior's funds. In Fall 2007, Junior and Senior first attempted to purchase plaintiff's controlling interest. Senior visited and inspected the AmerLink facility and discussed with National Consumer Cooperative Bank ("NCB"), AmerLink's principal lender, the financial situation for a purchase. A

proposed contract went through three or four drafts before Junior and Senior decided not to complete the purchase at that time.

Plaintiff alleged that by January 2008, Junior became aware that based on his mismanagement, AmerLink was facing financial difficulty. Junior told AmerLink's Vice-President that he wanted to show NCB a "higher than accurate sales volume" and asked the Vice-President to make false entries in AmerLink's sales and delivery reports to reflect this. When the Vice-President refused to falsify reports, Junior directed the Vice-President to send sales and delivery reports to Junior only.

In the summer of 2008, a second proposal regarding Junior and Senior's purchase of plaintiff's controlling interest in AmerLink was discussed. Plaintiff alleged that on or about 11 June 2008, Junior became aware that AmerLink was insolvent and was unable to purchase materials to fulfill its contracts. Regardless of this fact, Junior directed AmerLink staff to encourage customers to enter into sales agreements with AmerLink, to send deposits and additional funds to AmerLink, and to schedule deliveries. Junior became aware that he needed funds in excess of $2 million from Senior in order to keep AmerLink operating. From September 2007 through September 2008, Junior prepared false financial and delivery reports for AmerLink and directed AmerLink employees to falsify reports in order to conceal AmerLink's dire financial situation. Junior prepared these false reports "in order to mislead Plaintiff on the current state of AmerLink's sales and profits, to keep his

position as President and CEO of AmerLink, Ltd., and to facilitate his purchase of Plaintiff's majority interest in AmerLink, Ltd."

Plaintiff and Junior settled on an arrangement to accomplish their purpose of having Junior purchase plaintiff's majority interest in AmerLink through JRI, a North Carolina corporation formed by them. Plaintiff agreed to put all of his AmerLink shares into JRI. Junior agreed to put funds equivalent to the value of plaintiff's shares into JRI. Both Junior and plaintiff agreed that the value of plaintiff's AmerLink shares was $8 million and Junior agreed to invest $8 million primarily obtained from Senior. Junior and plaintiff also agreed that JRI, which was jointly owned by Junior and plaintiff, would invest its funds in AmerLink and become the majority shareholder of AmerLink. AmerLink would then obtain the "capital investment it needed to rescue it from insolvency and enable it to continue doing business." The plan also included for Junior to eventually purchase plaintiff's interest in JRI, making Junior the controlling owner of AmerLink.

Plaintiff further alleged that on 8 October 2008, plaintiff learned in a letter from an employee that Junior had been submitting false reports containing inflated sales and delivery figures. The letter provided no specifics but stated that the employee was " 'resigning under duress' because he could no longer trust [Junior] and would not be a party to 'lies and deception at AmerLink, Ltd.' " A few hours after receiving the letter, plaintiff met with Junior and confronted Junior with the

information he had just received. Junior admitted falsifying the reports but stated that he was "just 'fudging' the numbers a little bit, by small amounts, minor numbers." On 10 October 2008, plaintiff called Senior and left a message on Senior's answering device informing him of the following: that plaintiff was upset with Junior; plaintiff learned that Junior had been falsifying reports; Junior had been "running the company down" and concealing AmerLink's financial situation; there was a need to correct AmerLink's problems and to accomplish this, they needed the JRI deal in order to "get an infusion of capital" for AmerLink. On 13 October 2008, the AmerLink Board replaced Junior with plaintiff as CEO. Junior remained president and continued to assert that Senior would be making a sizable cash investment in AmerLink.

On 16 October 2008, pursuant to the agreement between himself and Junior, plaintiff transferred his AmerLink shares into JRI. Although the agreement required Junior to provide his investment of $8,000,000, he failed to do so. On 17 October 2008, Junior represented to plaintiff that $1.6 million from Senior was on its way to JRI. Accordingly, Junior and plaintiff signed and sent UBS Financial Services ("UBS") a written request in JRI's name to prepare a wire transfer for $1.6 million, once funds were available, from JRI's account into AmerLink's account. However, the funds were never received in JRI's account.

Plaintiff alleged that on or about 7 November 2008, Senior agreed to loan Junior up to $3 million, plus interest, to invest into JRI in order to overcome the problems arising from Junior's deception. Senior wrote a check payable to JRI in the amount of $300,000, signifying the initial $300,000 of Senior's loan of up to $3 million. Plaintiff and Junior endorsed this check and deposited it into AmerLink's account.

On 26 November 2008, Senior confirmed the 7 November 2008 loan agreement in writing to Junior in an e-mail in which he wrote "I will initially loan up to $3,000,000 to [JRI] with the understanding that $300,000 has already been contributed." On 11 November 2008, Junior sent plaintiff an e-mail, attaching a "proposed schedule of payments to [JRI]" that included as follows:

| | |
|---|---|
| $300,000 | Paid on November 7, 2008 |
| $1.7M | Paid by November 14, 2008 |
| $1.3M | Paid when loan closes on new Barth residence |
| $600,000 | Paid when Lantern Ridge Residence sells |
| $4.1M | Remaining to be paid as soon as my father is in a position to do so. This final payment may be made in full or in part. |

Also on 11 November 2008, Junior directed AmerLink staff to continue to tell customers that new investment funds were on the way. On 13 November 2008, Junior assured plaintiff that $1.7 million was on its way from Senior to UBS for JRI. Thereafter, Junior and plaintiff signed another request that UBS wire $1.7 million from JRI. However, because the funds were never received in the JRI account, no funds were ever transferred by UBS.

Although the first payment had already been made in the form of a $300,000 check from Senior to JRI, no additional payments were made into JRI by Junior. On 15 December 2008, plaintiff received AmerLink's financial reports for the 30 September 2008 end of the fiscal year and learned that AmerLink's actual financial situation was worse than Junior had represented. Plaintiff alleged that Junior had falsified the reports of AmerLink "to a far more severe degree than he had admitted." Plaintiff closed the doors of AmerLink on or about 15 December 2008.

The complaint further alleged that on 11 February 2009, plaintiff, through counsel, sent a letter to Junior advising him of his failure to make his contribution of funds to JRI, stating that Junior had knowingly and intentionally made false representations to the AmerLink Board of Directors, and demanding that Junior immediately remedy the situation by paying $8 million to JRI. On 12 February 2009, AmerLink filed for Chapter 11 bankruptcy. On 11 March 2009, Junior caused AmerLink's bankruptcy attorney to advise the Bankruptcy Court that within ten days AmerLink would seek approval of a $7.5 million loan from JRI and would use those funds to "complete its existing orders for log homes." A letter very similar to the letter sent from plaintiff's counsel to Junior on 11 February 2009 was sent to Senior on 20 February 2009.

Plaintiff alleged that on 9 March 2009, Senior sent Junior an e-mail for AmerLink's bankruptcy attorney that stated that he would "work with NCB to

achieve a mutually agreeable solution . . . regarding issues of their security" and that he would "provide financing, as needed, to meet the operating budget requirements of AmerLink LTD." On 17 March 2009, Junior wrote to plaintiff that he had sent an e-mail to AmerLink's bankruptcy attorney "about the money, told her it's in." Senior sent $200,000 to Junior for deposit into the JRI account. In April 2009, Senior agreed to loan Junior and his wife $7,500,000 at a rate of 2.5% interest. The $7,500,00 sum provided for the $8,000,000, less the $300,000 that Junior had provided by check directly to JRI and the $200,000 in Junior's bank account. On 11 April 2009, a Saturday, Junior allegedly informed plaintiff via e-mail "[m]oney to go in Monday. Do not worry about it. We will have funds available."

During the months of April and May, Junior sent plaintiff several e-mails regarding the transfer of funds from Senior, stating things such as "I believe we will absolutely make it work[,]" "[t]hings are going really well. We are knocking out all of the contract details to everything finalized with funding[,]" "[e]verything is coming together[,]" and "[d]ocs to be signed early in the week. Everything else to follow. Coming together as always planned." Plaintiff's complaint further alleged that in June 2009, Junior and plaintiff had discussions about changing their plans so that Junior would purchase plaintiff's interest in AmerLink and/or JRI outright. However, nothing materialized from those discussions. Throughout the month of July, e-mails were exchanged between Junior and plaintiff, Junior and AmerLink's

bankruptcy attorney, and Junior and NCB. AmerLink's bankruptcy attorney met with plaintiff and Junior, wanting to know when the $200,000 loaned by Senior to Junior would be deposited in AmerLink's operating account. Junior's attorney reported that it "would be deposited on Monday." Thereafter, Junior forged a bank statement and delivered it to AmerLink's bankruptcy attorney to reflect a $120,000 deposit into AmerLink's bank account when no deposit had been made. This forged bank statement was one of two parts of a criminal information for the felony of bankruptcy fraud of which Junior was convicted on 13 May 2010 based on his plea of guilty in the United States District Court for the Eastern District of North Carolina.

The complaint also alleged that on 17 August 2009, Junior submitted to AmerLink's bankruptcy attorney an e-mail purporting to be from Senior which committed to providing "money necessary to purchase the AmerLink loan from NCB. I understand that this may be $8.2M. This loan will be made upon plan confirmation." The following day on 18 August 2009, Senior notified AmerLink's bankruptcy attorney that he was not the source of the 17 August 2009 e-mail and that "he has no intention to provide any financing in connection with the AmerLink Chapter 11." AmerLink's attorneys promptly applied to convert their Chapter 11 bankruptcy to a Chapter 7 bankruptcy. The 17 August 2009 e-mail was the second part of a criminal information for the felony of bankruptcy fraud of which Junior was

convicted on 13 May 2010 based on his guilty plea in the United States District Court for the Eastern District of North Carolina.

Plaintiff's complaint advanced the following claims against defendants: breach of contract; breach of contract as third party beneficiary; breach of fiduciary duty (constructive fraud); fraud; punitive damages; unfair and deceptive trade practices ("UDTP"); civil conspiracy; and a derivative claim.

On 27 January 2014, Senior filed a motion for summary judgment, arguing that (1) plaintiff did not commence the action against Senior within the statute of limitations because he knew or should have known about the alleged scheme more than four years prior to commencing the present action and (2) plaintiff lacked standing to assert the claims made against Senior because all such claims were property of the Chapter 7 bankruptcy estate of AmerLink and all such claims were settled by the bankruptcy trustee[1].

On 20 February 2014, Junior filed a motion for summary judgment arguing that plaintiff lacked standing because all such claims were the property of the Chapter 7 bankruptcy estate of AmerLink and were settled by the trustee in an agreement resolving the litigation against plaintiff, Junior, Senior, and others that

---

[1] On 23 April 2011, the AmerLink bankruptcy trustee filed an adversary proceeding against Junior, Spoor, Senior, JRI and several others based on claims such as fraudulent conveyances, preferential transfers, breach of fiduciary duties, constructive trust, unjust enrichment, civil conspiracy, etc. This adversary proceeding was settled on 6 September 2011. The settlement agreement was approved by the Bankruptcy Court on 19 September 2011.

the trustee brought in the form of an adversary proceeding in the AmerLink bankruptcy proceeding.

Following a hearing held on 15 May 2014, the trial court entered an order on 19 June 2014, granting summary judgment in favor of defendant Senior as to both bases of statute of limitations and lack of standing. The trial court also entered summary judgment in favor of defendant Junior based on lack of standing. The trial court dismissed plaintiff's claims against defendants Senior and Junior with prejudice.

On 30 June 2014, plaintiff filed a motion for reconsideration pursuant to Rules 59 and 60 of the North Carolina Rules of Civil Procedure. The trial court denied this motion through an order entered 2 September 2014. On 17 September 2014, plaintiff filed a notice of voluntary dismissal as to defendant JRI. On 19 September 2014, plaintiff filed notice of appeal from the 19 June 2014 summary judgment order and from the 2 September 2014 order denying his motion for reconsideration.

## II.   Standard of Review

The North Carolina Rules of Civil Procedure provide that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c) (2013).

> A defendant who moves for summary judgment assumes the burden of positively and clearly showing that there is no genuine issue as to any material fact and that he or she is entitled to judgment as a matter of law. A defendant may meet this burden by: (1) proving that an essential element of the plaintiff's case is nonexistent, or (2) showing through discovery that the plaintiff cannot produce evidence to support an essential element of his or her claim, or (3) showing that the plaintiff cannot surmount an affirmative defense which would bar the claim.

*James v. Clark*, 118 N.C. App. 178, 180-81, 454 S.E.2d 826, 828 (1995) (citation and quotation marks omitted).

"[T]he record is to be viewed in the light most favorable to the non-movant, giving it the benefit of all inferences which reasonably arise therefrom." *Epps v. Duke Univ.*, 122 N.C. App. 198, 202, 468 S.E.2d 846, 849 (1996) (citation omitted). "[W]e review the trial court's order de novo to ascertain whether summary judgment was properly entered." *Bumpers v. Cmty. Bank of N. Va.*, 367 N.C. 81, 87, 747 S.E.2d 220, 225-26 (2013).

## III.    Discussion

Plaintiff argues that the trial court erred by granting summary judgment in favor of (A) Senior on the grounds that plaintiff did not commence an action against Senior within the time required under the relevant statute of limitations and in favor of (B) both Junior and Senior based on lack of standing.

### A.    Statute of Limitations

In his first argument, plaintiff contends that the trial court erred by granting summary judgment in favor of Senior on the grounds that plaintiff failed to commence an action within the relevant statute of limitations. We agree.

Plaintiff filed his first complaint on 5 October 2011 but did not include Senior as a defendant until he filed his 14 February 2012 first amended complaint. Plaintiff alleged the following claims[2] against Senior: breach of contract as third party beneficiary; fraud; and UDTP.

"In general a cause or right of action accrues, so as to start the running of the statute of limitations, as soon as the right to institute and maintain a suit arises." *Pierson v. Buyher*, 330 N.C. 182, 186, 409 S.E.2d 903, 905 (1991) (citation omitted). "[A]n action for breach of contract must be brought within three years from the time of the accrual of the cause of action. . . . The statute begins to run on the date the promise is broken." *Penley v. Penley*, 314 N.C. 1, 19-20, 332 S.E.2d 51, 62 (1985) (citations omitted); *see* N.C. Gen. Stat. § 1-52(1) (2013). An action for fraud must be brought within three years as well. For fraud "the cause of action shall not be deemed to have accrued until the discovery by the aggrieved party of the facts constituting

---

[2] Plaintiff also filed a civil conspiracy claim against Senior in his 14 February 2012 amended complaint. "This Court has applied the three-year limitations period of N.C. Gen. Stat. § 1-52(5) to a civil conspiracy claim." *Carlisle v. Keith*, 169 N.C. App. 674, 685, 614 S.E.2d 542, 549 (2005). However, because plaintiff does not specifically argue that the trial court erred in granting summary judgment in favor of Senior on the civil conspiracy claim, we deem this argument abandoned. N.C. R. App. P. 28(a) (2015) (stating that "[i]ssues not presented and discussed in a party's brief are deemed abandoned").

the fraud or mistake." N.C. Gen. Stat. § 1-52(9). "For purposes of N.C.G.S. 1-52(9), 'discovery' means either actual discovery or when the fraud should have been discovered in the exercise of 'reasonable diligence under the circumstances.'" *Forbis v. Neal*, 361 N.C. 519, 524, 649 S.E.2d 382, 386 (2007) (citation omitted). "[W]here a person is aware of facts and circumstances which, in the exercise of due care, would enable him or her to learn of or discover the fraud, the fraud is discovered for purposes of the statute of limitations." *Jennings v. Lindsey*, 69 N.C. App. 710, 715, 318 S.E.2d 318, 321 (1984). "Ordinarily, a jury must decide when fraud should have been discovered in the exercise of reasonable diligence under the circumstances. This is particularly true when the evidence is inconclusive or conflicting." *Forbis*, 361 N.C. at 524, 649 S.E.2d at 386. Finally, a claim for UDTP "shall be barred unless commenced within four years after the cause of action accrues." N.C. Gen. Stat. § 75-16.2 (2013). "Under North Carolina law, an action accrues at the time of the invasion of plaintiff's right. For actions based on fraud, this occurs at the time the fraud is discovered or *should have been discovered* with the exercise of reasonable diligence." *Nash v. Motorola Communications & Electronics, Inc.*, 96 N.C. App. 329, 331, 385 S.E.2d 537, 538 (1989) (citations and quotation marks omitted) (emphasis in original). Therefore, plaintiff's claims against Senior are subject to either a three-year or four-year statute of limitations.

In the present case, Senior's motion for summary judgment stated that plaintiff's claims against Senior were barred by the statute of limitations because plaintiff knew, or should have known, of the alleged fraud more than four years prior to commencing the action against Senior. Senior argued in his motion and argues now that in December 2007, plaintiff failed to exercise reasonable diligence in discovering the alleged fraud. Senior asserts that plaintiff "became aware that [Junior] had been providing him with false sales information reports" and referred to Junior as a "m***erf***ing liar" in a conversation with Tom Slocum, an officer and director of AmerLink. Senior also argued that plaintiff discovered greater evidence of Junior's alleged fraud in early October 2008 when an AmerLink employee, David Zotter, included in his resignation letter that Junior could not be trusted. Lastly, Senior argues that on 11 February 2009, plaintiff's attorney sent a letter to Junior accusing Junior of instances of fraud and threatening to sue Senior and Junior if AmerLink did not file a petition for relief under Chapter 11 of the United States Bankruptcy Code. Accordingly, because plaintiff waited more than three years to file his first amended complaint, Senior argues that plaintiff's claims should be time-barred.

We note that Senior's arguments are misplaced as they center around when plaintiff's actions accrued as to Junior. Because the trial court granted summary judgment in favor of Senior only on the basis of a lapse in the statute of limitations,

we review the evidence to determine when each cause of action accrued as to Senior only. The December 2007 incident on which Senior relies regards plaintiff's discovery of the alleged fraudulent actions of Junior. Furthermore, we note that Senior's arguments that plaintiff discovered even more evidence of Junior's alleged fraud in October 2008 and that on 11 February 2009 plaintiff's attorney sent a letter to Junior accusing him of fraud only deals with the circumstances surrounding the accrual of actions against Junior.

Viewed in the light most favorable to the non-moving party, plaintiff's evidence demonstrates that Junior informed plaintiff that he was interested in purchasing plaintiff's controlling interest in AmerLink using funds provided by Senior before the fall of 2007. Junior and plaintiff made a plan to accomplish their purpose in having Junior purchase plaintiff's controlling interest in AmerLink by forming JRI. Junior and plaintiff agreed that plaintiff would put all his AmerLink shares into JRI and Junior would put funds equivalent to the value of plaintiff's shares into JRI. Plaintiff and Junior agreed that the value of plaintiff's shares was $8 million and so that would be the amount obtained primarily from Senior. JRI would then invest its funds in AmerLink and JRI would become the majority shareholder of AmerLink. The plan was for Junior to eventually purchase plaintiff's interest in JRI, allowing for Junior to be the controlling owner of AmerLink. In October 2008, plaintiff learned from an employee that Junior had been submitting false reports inflating AmerLink's sales

and delivery figures. When plaintiff confronted Junior, Junior admitted to the false reports but claimed he was "just 'fudging' the numbers a little bit, by small amounts, minor numbers." Plaintiff informed Senior of the falsifying of reports by Junior via a telephone message on 10 October 2008. Junior told plaintiff that he had admitted to his father that he had been falsifying the reports but ensured plaintiff that "everything will be fine, that [Senior] had told him that everything was going to go through." On 7 November 2008, Senior wrote a check payable to JRI in the amount of $300,000. This check was endorsed by plaintiff and Junior on behalf of JRI and deposited into AmerLink's bank account. On 11 November 2008, Junior sent plaintiff an e-mail, setting out a proposed schedule of payments to JRI. Plaintiff alleged that "[d]espite repeated assurance by [Junior] that he would make additional payments" to JRI, Junior failed to make any additional payments besides the $300,000 payment made by Senior in November 2008. AmerLink filed for bankruptcy under Chapter 11 on or about 12 February 2009 relying on the misrepresentations from Junior that Senior would be providing an $8 million investment in AmerLink. On 17 August 2009, Junior submitted to AmerLink's bankruptcy counsel a document that he represented to be an e-mail from Senior committing to providing "money necessary to purchase the Amer[L]ink loan from NCB. I understand that this may be $8.2M. This loan will be made upon plan confirmation." It was not until 18 August 2009 that Senior notified AmerLink's bankruptcy attorneys that Senior

was not the source of the e-mail and had "no intention to provide any financing in connection with the AmerLink Chapter 11."

Giving plaintiff the benefit of all reasonable inferences, we hold that plaintiff's pleadings present a genuine issue of material fact as to when Senior's alleged fraud was discovered or should have been discovered by plaintiff. Because the forecast of evidence was inconclusive and conflicting, "a jury must decide when fraud should have been discovered in the exercise of reasonable diligence under the circumstances." *Forbis*, 361 N.C. at 524, 649 S.E.2d at 386. A jury could determine that plaintiff's causes of action did not accrue until 18 August 2009 when Senior notified AmerLink's bankruptcy attorneys that Senior had no intention of financing AmerLink's Chapter 11 bankruptcy, contrary to the assurances made by Junior. Therefore, plaintiff's first amended complaint filed 14 February 2012 that included Senior as a defendant would have been commenced within the three-year statute of limitations for the breach of contract and fraud claims and commenced well within the four-year statute of limitations for the UDTP claim. Accordingly, we hold that the trial court erred by granting summary judgment in favor of Senior on the basis of a lapse of the statute of limitations.

## B.     Standing

In his second argument on appeal, plaintiff contends that the trial court erred in granting summary judgment in favor of both Junior and Senior on the ground that

plaintiff lacked standing.  Plaintiff argues that the adversary proceeding filed by the AmerLink bankruptcy trustee does not preclude plaintiff, Junior, or Senior from bringing claims against each other in their individual capacities.  Plaintiff also argues that his claims are fundamentally different from the claims of a generic shareholder in a derivative suit and that he owns his own claims, not AmerLink, the bankruptcy estate, nor the trustee.  We agree.

"In order for a court to have subject matter jurisdiction to hear a claim, the party bringing the claim must have standing." *Revolutionary Concepts, Inc. v. Clements Walker PLLC*, 227 N.C. App. 102, 106, 744 S.E.2d 130, 133 (2013). " '[S]tanding' to sue means simply that the party has a sufficient stake in an otherwise justiciable controversy to obtain resolution of that controversy." *Mitchell, Brewer, Richardson, Adams, Burge & Boughman, PLLC v. Brewer,* 209 N.C. App. 369, 379, 705 S.E.2d 757, 765 (2011).

"When a corporation enters bankruptcy, any legal claims that could be maintained *by the corporation* against other parties become part of the bankruptcy estate, and claims that are part of the bankruptcy estate may only be brought by the trustee in the bankruptcy proceeding." *Keener Lumber Co. v. Perry*, 149 N.C. App. 19, 25, 560 S.E.2d 817, 822 (2002) (citations omitted) (emphasis in original).  The issue of whether plaintiff's claims are property of the bankruptcy estate compels us

to examine the nature of plaintiff's claims under state law. *Id.* at 26, 560 S.E.2d at 822.

> Under North Carolina law, directors of a corporation generally owe a fiduciary duty *to the corporation*, and where it is alleged that directors have breached this duty, the action is properly maintained *by the corporation* rather than any individual creditor or stockholder. However, where a cause of action is founded on injuries peculiar or personal to an individual creditor or stockholder, so that any recovery would not pass to the corporation and indirectly to other creditors, the cause of action belongs to, and is properly maintained by, that particular creditor or stockholder.

*Id.* (citations and quotation marks omitted) (emphasis in original).

"A 'derivative proceeding' is a civil action brought . . . 'in the right of' a corporation, . . . while an individual action is . . . [brought] to enforce a right which belongs to [plaintiff] personally." *Morris v. Thomas*, 161 N.C. App. 680, 684, 589 S.E.2d 419, 422 (2003) (citation omitted). "The well-established general rule is that shareholders cannot pursue individual causes of action against third parties for wrongs or injuries to the corporation that result in the diminution or destruction of the value of their stock." *Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 658, 488 S.E.2d 215, 219 (1997). Our Supreme Court has adopted two exceptions to this general rule:

> [A] shareholder may maintain an individual action against a third party for an injury that directly affects the shareholder, even if the corporation also has a cause of action arising from the same wrong, if the shareholder can

> show that the wrongdoer owed him a special duty or that the injury suffered by the shareholder is separate and distinct from the injury sustained by the other shareholders or the corporation itself.

*Energy Investors Fund, L.P. v. Metric Constr., Inc.,* 133 N.C. App. 522, 524, 516 S.E.2d 399, 400 (1999) (citation omitted).

The record before us demonstrates that on 23 April 2011, the AmerLink bankruptcy trustee filed an adversary proceeding against Junior, plaintiff, Senior, JRI and several others based on claims such as fraudulent conveyances, preferential transfers, breach of fiduciary duties, constructive trust, unjust enrichment, civil conspiracy, etc. The bankruptcy trustee alleged, *inter alia*, that plaintiff, Junior, and other AmerLink directors engaged in the creation of new companies and transfer of assets to companies in an effort to sell a substantial portion of plaintiff's ownership interest in AmerLink. The trustee also alleged that an employee stock option plan was adopted at the urging of plaintiff and Junior effective 1 October 2005 and that plaintiff, Junior, and AmerLink's directors' actions were solely for the purpose of creating a means for plaintiff to extract as much cash as possible from the business and for Junior to be in a position to take control of the company. This adversary proceeding was settled on 6 September 2011. The trustee dismissed with prejudice all claims and causes of action against Senior, Junior, and plaintiff and released them from claims by the trustee or bankruptcy estate. Several parties, including plaintiff, Junior, Senior, and JRI agreed to "waive all claims *against the estate*, including all

rights associated with the proofs of claim filed in the underlying bankruptcy case, and all other claims now known or hereafter acquired *against the Trustee, individually and as Trustee, counsel for the Trustee, the Trustee's attorneys and attorneys' employees, and the bankruptcy estate*." (emphasis added). The settlement agreement was approved by the Bankruptcy Court on 19 September 2011.

As explicitly stated in the settlement agreement, Junior, Senior, and plaintiff waived all claims against the estate, the trustee, individually and as trustee, counsel for the trustee, the trustee's attorneys and attorneys' employees, and the bankruptcy estate. It also released Junior, Senior, and plaintiff from claims by the trustee or bankruptcy estate. However, the settlement agreement did not provide for waiver of individual actions between plaintiff, Junior, or Senior.

Plaintiff argues that he was not an AmerLink shareholder at the time his actions accrued against Junior and Senior. Nonetheless, even if plaintiff was an AmerLink shareholder at the time his claims accrued against Junior and Senior, plaintiff's breach of contract, fraud, and UDTP claims arise from Junior and Senior's alleged conduct in their individual capacities. Relying on the agreement between himself and Junior, plaintiff, in his individual capacity, invested his majority interest AmerLink shares into JRI on 16 October 2008. Junior and plaintiff agreed that the value of plaintiff's shares was $8 million. Junior had previously agreed to put funds

equivalent to the value of plaintiff's shares into JRI with financial assistance from Senior but thereafter failed to fulfill his obligation to plaintiff.

Plaintiff may maintain an individual action against Junior and Senior because plaintiff alleges that he suffered an injury, separate and distinct from other AmerLink shareholders or AmerLink itself. Plaintiff's alleged injury of investing $8 million worth of AmerLink stock into JRI directly affected plaintiff and was separate and distinct from an injury sustained by a basic AmerLink shareholder or AmerLink. Plaintiff's claims are not based on the diminution of the value of AmerLink stock. No other AmerLink shareholder, no other individual, nor AmerLink can allege the following: that they were fraudulently induced into investing $8 million worth of AmerLink shares into JRI, relying on the assurances from Junior that he would invest funds equivalent to plaintiff's shares, primarily obtained from Senior; that Junior breached an agreement in forming JRI by failing to invest $8 million into JRI; and, that Junior and Senior committed an UDTP causing injury to plaintiff. These claims belong to plaintiff alone. Because plaintiff's claims do not belong to AmerLink, they were not the property of AmerLink's bankruptcy estate. Accordingly, we reject Junior and Senior's arguments that AmerLink's bankruptcy estate had exclusive standing to bring the challenged claims and that plaintiff's claims are derivative.

Furthermore, Junior and Senior contend that plaintiff suffered no injury because AmerLink was insolvent before plaintiff pledged any shares to JRI and

therefore, the AmerLink shares had no value. However, we note that there was evidence that both plaintiff and Junior agreed to the value of plaintiff's AmerLink shares as $8 million at the time they made an agreement. The record also demonstrates that on 7 November 2008, Senior wrote a check payable to JRI in the amount of $300,000. The check was endorsed by Junior and plaintiff on behalf of JRI and deposited into AmerLink's account. Taking this evidence in the light most favorable to plaintiff, plaintiff's shares were of some value above zero, leaving a genuine issue of material fact as to the value of plaintiff's shares.

Based on the foregoing, we hold that plaintiff had standing to sue Junior and Senior and that the trial court erred by granting summary judgment in favor of Junior and Senior on the standing issue. Accordingly, we reverse the order of the trial court.

## IV. Conclusion

Where the trial court erred in granting summary judgment in favor of Senior on the issue of statute of limitations and in favor of both Senior and Junior on the issue of lack of standing, we reverse the order of the trial court.

REVERSED.

Judge STEPHENS and ZACHARY concur.